Case number 14-5195, Scenic America, Inc. Appellant v. United States Department of Transportation, et al. Mr. Lutz for the Appellant, Mr. Sandberg for Appley's DOT, et al. And Mr. Chamigan for Intervenor Appley Outdoor Association of America, Inc. Good morning, Your Honors. Good morning. This case is about how an agency took an invalid shortcut to help digital billboards multiply and shielded its policymaking decision from the scrutiny of those who will suffer from an increase in light pollution and public safety impacts. The Federal Highway Administration's 2007 guidance creating acceptable criteria for state proposals of digital billboards is both a legislative rule that the agency failed to usher through notice and comment process and a rule that contravenes the customary use provision of the Highway Beautification Act. We've appealed the District Court's decision on summary judgment, so with the Court's permission, I'd like to start with the notice and comment claim. I have a question about standing. Yes, sir. And that is with respect to, I guess, your first claim, if we were to, I guess, set aside the interpretation on the grounds asserted in your first claim, we wouldn't really be repudiating it. We would just be saying that it was invalidly adopted, right? That's right, Your Honor. So then how is there any evidence of redressability there? I mean, you allege in your complaint, I think it's paragraph 21, that vacature of the 2007 guidance would redress your injury by requiring all current digital billboards be removed. And for purposes of motion to dismiss, we'd have to accept that, I guess is true. But we don't at summary judgment. Is there any evidence of that in the record? That the billboards would be removed? Yes. No, Your Honor, there's not. To answer your question about redressability for the notice and comment claim, well, first, the Lujan footnote 7 points out that for procedural injuries, the burden of showing redressability is reduced. But even here, the notice and comment claim, if it were, if it did vacate, if the court did vacate the decision, the... Excuse me, sorry. So if they vacated on procedural grounds, the redress that you'd get is that you'd get a process. We would. We would get an additional process. You'd get an opportunity to go through notice and comment. Right. And that itself is a kind of redress, assuming that this is a rule that warrants that. Yes, Your Honor. In addition, there are multiple division offices which had previously rejected the reading of the decision. And they would now think, oh, we don't have to reject it because central office has told us that this is okay. Maybe they would, though, still reject it because for policy reasons of the state, they don't want to use that latitude. So, I mean, I haven't, so there's a redressability on the procedural claim, but there's also a redressability question on the claim of, you know, the substantive claim about whether the agency has misread the statute. And this is a very peculiar case in the sense that, you know, we're not looking to the language of the federal statute. We're looking to the way the agency has interpreted a group of actions by states to give content to the language of the federal statute. And the group of actions by the states is what it is. So the fact that the federal government is coming in with this guidance and saying, oh, this is what we see out there, and if they took that away and said, sorry, we never meant to say what we see out there, it would still be what's out there. And so I'm not sure how taking that away redresses your injury. Well, what it does is it removes this barrier of acceptable criteria. So by the billboard still being out there. But that wasn't a barrier, because look at all the states that got approval for the very thing that the Federal Highway Administration is observing is approvable. Certain states did get approval, that's right. Many, right? Many, but not all. Texas, New York, and Kentucky all had division offices rejecting those. And by removing this acceptable criteria decision, they would be able to return to rejecting those digital billboards. Or maybe what the guidance says is that was an error for those few offices to have rejected that. Because when we look out there and see the custom, we see that it seems to be consistent with having a certain amount of what is the district judge called dynamic lighting or dynamic billboards. Right. First, I wouldn't say that those division offices, if they return to be able to reject these digital billboards, they would likely return to that decision because they were not just looking to the custom of what's out there now, but reading the terms of the federal state agreements and finding that intermittent meant intermittent, meant that something that changes its lighting every four seconds or ten seconds. Who's the guy that's doing that reading, the district offices? The district offices interpreting the state billboard or the state DOT's proposals and permits. So what we saw in Texas, for example, was a division office that had previously rejected, in 2006, was rejecting state billboard proposals. And as soon as this guidance came out, as expressed in the Lloyd Declaration during Appendix 41, there was a significant increase in state permit billboard proposals as well as approvals by the division office. I think 150 digital billboards have been put in place in Texas. Now, if the court were to set aside, even on notice and comment grounds, the 2007 guidance, then the Texas office could return to rejecting those proposals. But what reason is there to think that it would? You're speculating that the relationship between the Texas divisional office and the state of Texas is such that the divisional office would change its course. What reason is there to believe that? Just because they used to do it differently. Now they've changed with relying on the guidance. The guidance is rescinded. Right. But they have a relationship with the state of Texas. They do. The Department of Transportation. They're also the same people who made the decision that had previously interpreted the guidance as, or had interpreted the FSA as. Now they know that their superiors in Washington disagree. They know that. Whether they rescind it or not, they know what Washington thinks, right? Well, I'm not sure that they know what their superiors' definition of intermittent is. In fact, the main officials who were drafting the guidance the night before the guidance came out were still having trouble defining the term intermittent. In fact, all they did was point to what various states had, other division offices had decided was acceptable criteria. I know I'm missing something that probably everybody else in the room understands. But we have a statute under which the Federal Highway Administration is acting that says, it's a crazy long sentence, signs, displays, and devices whose size, lighting, and spacing consistent with customary use is to be determined by agreement between the several states and the Secretary. And I'm not sure where, how to read consistent with customary use in that statute. Is it a precondition or limit that the Secretary or the Housing Authority, I mean the Highway Authority, interprets that caps the displays, devices whose size, lighting, and spacing is to be determined by agreement? Or is customary use something that evolves based on agreement between several states and the Secretary? There's like a basic kind of framing of the issue that I find still a little bit elusive. Thanks, Your Honor. So the way I would look at it is that the Highway Beautification Act has asked the states and the Highway Administration to come to an agreement that sets out the standards consistent with customary use. So that determination of the federal-state agreement is what is customary use at the time. Say that again. The determination in the FSA is what's customary use at the time. And that sets out certain parameters within which one can be flexible, the state can be flexible, and within which billboards may evolve. So, for example, the tri-vision signs, which do not violate the lighting prohibitions on flashing, intermittent, and moving sites. That's a type of evolution which can occur within... That was evolution of practice, not of an FSA. So you're saying the FSAs are really the touchstone here. Yes, it is. But then it seems like the FSAs, in turn, are what give content to customary use in the federal statute. So if the FSAs over time are amended, then that's going to change what counts as customary use, is that right? Yes, that's right. And are they amended with some regularity, no? Not that often, no, Your Honor. Most of the FSAs are still residual from 1960 and 1970, the 1960s and 70s. All right. So when we talk about... And that's exactly why the Highway Administration is issuing a 2007 guidance that attempts to interpret these FSAs, which were set back in the 1960s. Now, there's an amicus that says that the customary use means the use that was customary in the 1960s when the Act was passed. And I don't take that to be your position. As I see it, the FSAs themselves identify what is customary use. And so... The FSAs can change, though, so there's a kind of a dynamism there. Yes, that's right. And so the language of the FSAs which are being interpreted, the prohibitions on intermittent flashing and moving lights, are mostly the FSAs from the 1960s and 70s, which really are not all that different from 1965 when the Act was passed. The guidance document here says it's based on actual practices among the divisional offices, right? So there's been an evolution without necessarily amending the FSAs. There's been an interpretation evolving over time among the different offices. Your Honor, I'm not seeing any interpretation that's going on here, but rather an arbitrary selection between practice that the various division offices have been doing. Well, I'm saying the divisional offices apparently were interpreting the FSAs to allow various things which are synopsized in the guidance. To the extent that they have been interpreting them, that didn't make it into the 2007 guidance, and it doesn't seem to be a part of the analysis that the... Well, the last paragraph of the guidance document seems to say this is based on surveying practices among the divisional offices, correct? That's right, Your Honor. But that surveying the practices of the divisional offices is just a process. It's not actually analyzing the types of interpretation that the... I understand that, but what if the divisional offices in turn were applying the FSAs? They were authorizing or not authorizing things pursuant to the FSAs. So if Your Honor, if they were interpreting the FSAs and had some interpretive analysis, some logical appellate-type reasoning that Catholic Health Initiatives compels us to look at, that did not make it into the 2007 guidance. There's nowhere within the 2007 guidance that even acknowledges that the division offices were performing any sort of interpretation, but simply probably similarly choosing amongst various numerical criteria. But it's curious that you say that you're asking for kind of what you refer to as appellate-type reasoning, because the statute seems to not be looking for that. The statute seems to be looking for custom. So I think that's why, as Judge Ginsburg was saying, aren't they precisely... Isn't the Federal Highway Administration in promulgating this guidance precisely looking at it and saying, well, what is custom but what most people do? And let's go out and look at what the relevant actors that are specified by the statute are doing. And it's a little curious because it's like, what are we doing with them? It's like, what are we doing with the states as reflected in the FSAs? And the, as you say, with the tri-phase thing, and how are they dealing with new sign technology? And so the notion that you need some more kind of reasoning doesn't seem to necessarily fit this statutory scheme. Your Honor, I disagree with you on this. The interpretation that's occurring here is the interpretation not fully of customary use, but also of the FSAs themselves. Right. And so that is... A minute ago you just said there wasn't any interpretation of that. He's saying that's what FLAG is. Sorry, that's what the 2007 guidance would be doing if it needed to be doing appellate-type logical reasoning. And here those are clearly defined terms. So what customary use was determined by the statute has then been defined through a formal rulemaking process, the creation of these FSAs. And that, in turn, is what the 2007 guidance claims to be interpreting, the prohibitions on intermittent flashing and moving lights. And the interpretation there does ask this circuit's case law does ask that we look for appellate-type reasoning from finding a line from intermittent to the 2007 guidance. So what you're saying is, yes, the administration looks out and says, let's look at the FSAs' language. And one dominant category of FSA language is the language on dynamic lighting. Yes. And so the administration can say in the way that I'm talking about in sort of surveying, okay, that's a customary standard. But further, so that's the customary use. And then how to read that in a lawyerly way or an agency-type way that is rational is a question for the Federal Highway Administration. How to interpret it in this lawyerly way? Yes. And not for the ‑‑ maybe it could be for the division offices, but only if they were doing it, and you're saying they're doing it basically irrationally. Well, were they to perform the process of interpretation as opposed to legislation, arbitrary selection, then they could perform an interpretive rule. Alternatively, they could go through a notice and comment process. Or if they wanted to amend, go through a notice and comment process to set out certain numbers if those fell within the customary use without violating the customary use provision. Or they could amend, if they wanted to amend the FSAs, they could go ahead and amend the FSAs. What they did here was select arbitrarily amongst various criteria by going through, by not going through a notice and comment process, by claiming it to be an interpretive rule. So avoiding public scrutiny in the process. And now, actually, the Highway Administration is seeking our deference for their interpretation and avoiding judicial scrutiny as well. A second reason for why. If I may, I'd like to go back to Sam's question for a moment, since it's interior to everything else. You claim, well, what do you claim as, I think we're on common ground that the parties are, that insofar as the actions have been challenged consume or cause you to engage in additional lobbying or litigation. But that's not a cognizable harm. So what is it that the organization does that is not lobbying? So Scenic America counsels members and constituents. Well, wait a minute. That's, counsels them about what? About lobbying? About how to get what they want? About how to fend off digital billboards that are coming to the neighborhood. So going before zoning boards. So how is that different from lobbying? That is... You're pressing, you're advocating your case in other fora. Correct? And now you have to advocate it in more fora than before because the guidelines have been relaxed. They're also providing educational material to their members and constituents on how to, how also to protect themselves from digital billboards coming into the neighborhood. And is that not the same as... No, I wouldn't say that it is. It's quite similar to the organization Home and Havens in helping, assisting their members and constituents from... The harm in Havens was that the landlord's conduct was shrinking the supply of housing available for the agency's minority clientele. Right? Yes. It had nothing to do with, the harm was not that they had to litigate more or that they had to do more persuasive activities. Right. Similarly, the harm here is the increase in digital billboards in members' and constituents' neighborhoods, which Scenic America believes to be unlawful as well. And this 2007 guidance... So it's the actual increase in the billboards, that's the harm? Yes. So I would point you to Metropolitan Washington. There was not only the making it more difficult for that organization to advocate to reduce aircraft noise... So who have you got as a member who's exposed to more billboards as a result of the guidance? Nikki Lalibert. In Minnesota? In Minnesota, Joint Appendix 51 and 52. So she not only helped support the organizational standing, but I think we're on strong grounds with associational standing as well. This court has found that the aesthetic injury to the type that Ms. Lalibert has suffered of having an increased number of flashing target bullseyes and McDonald's arches flashing off of a pond into her house would amount to aesthetic standing, which her being a member is germane to the interests of Scenic America. What was the status of Minnesota's divisional office before the guidance? They had... They had not taken a position. They had not taken a position. They said that they were... Go ahead. Sure. If you look at Administrative Record, page 188, they said that they were going to follow the lead of the Federal Highway Administration. This was just in advance of the 2007 guidance, and that digital billboards may be permitted on state and federal highways within the bounds of the federal regulations. So they were waiting for the 2007 guidance to make a determination. So they're essentially saying whatever's allowed by the feds, we're going to allow it? Yes, Your Honor. In Washington? Yes, Your Honor. And the billboard that is causing Ms. Lalibert to suffer aesthetic injury has been constructed since then. It was built in 2010. Okay. Why didn't you bring a list that it was a 706 violation of APA? We believe that we had... Your attack on the rules... Right. ...suggests that you think that they're arbitrary perpetrators, but you don't make that claim. No, we didn't. We focused solely on the customary use provision, finding that it was contrary to law. It seems a little odd, doesn't it? I mean, reading the brief, it looks like you're building up to the 706 claim, which was never there. No, we did not present that, Your Honor. Okay. However, we have presented a notice-in-common claim, and, you know, not only was this an interpretive rule, a legislative rule because it imposed arbitrary numeric criteria... There we go. ...but it also is a hundred... It's the missing claim, so that's not in there. Well, go ahead. Yes, so the district court did mention that that was a backdoor argument for our claim. It's been presented here in the notice-in-common context. It's also... On appeal. I'm sorry? What do you mean? You're now raising it on appeal? We're not raising it on appeal. We're making the arbitrary and capricious arguments arbitrary, particularly with the second argument for why this is a legislative rule, which is that it's 180 degrees counter to the interpretation that it claims to interpret. So you think the word intermittent is not susceptible to interpretation? It may be susceptible to interpretation. It's not susceptible to this interpretation, Your Honor, which is... So the definition of intermittent is that something that starts and stops at intervals, and what the 2007 guidance has allowed is light to start for four seconds, stop, and then start again for four seconds again. Other courts that have looked at this have found that that meets the plain meaning of intermittent. So this essentially writes intermittent out of the statute, analogous to the National Family Planning case where a subsequent interpretation, which allowed for doctors to counsel their patients on abortion, claimed to be interpreting a regulation that prohibited doctors from counseling patients on abortion. What we have here is the allowance of something that is clearly prohibited in the regulation. So going back to the question I had about the relationship between the definition of customary use and the state practices, you are basically saying what is happening at the permitting level is not supposed to inform the highway administration's notion of what's customary use. What the highway administration looks to is language and FSAs. And then once that's been settled on in the sum of the FSAs, that is something that the highway administration can sum up in a guidance, but it's a legal task. And given that the furthest they go in permitting lighted billboards is to prohibit intermittent flashing, dynamic lighting, that they have to actually do something that prohibits that. Their interpretation would have to honor that. Yes, it can't go beyond the bounds of the federal state agreements. Are there any other questions? I think you've acknowledged, or maybe not in the briefs, that the lighting that's on 12 hours and off 12 hours is not inconsistent. I think you're talking about the New York Division Office's position. No, Your Honor, our position is that something that would remain on steady in one. Beyond that, so that would remain steady continuously. So it can't come on at dawn and go off at dusk? I thought you were saying that was totally fine. No, I don't think we took that position in the briefs. Well, do you think that's intermittent or not intermittent? No, it would be intermittent because that, again, is starting and stopping at intervals. So that's why you think the word intermittent is not subject to interpretation. It means simply on or off all the time. On or off continuously, yes. And what about the date and time? Thanks, Your Honor. That's a way to interpret what was customary use at the time. So the only types of signs that were turning on and off intermittently, flashing lights, emitting lights on and off intermittently, were what's in the exceptions of the FSAs, which is time, date, and temperature. Everything else was prohibited. So those were written into the FSAs in all the states? In most of all, if not all of the states. I would expect that they're in all of the states that similarly have the prohibitions on intermittent moving and flashing lights, which the 2007 guidance claims to be interpreting. So how is that exception written in the FSA consistent with your position? I'm not sure. Maybe I'm losing grasp of where the prohibition comes from. From the FSAs or from the regulation or from the statute? From the regulation. So the customary use sets out the standard and asks the federal state agreements to set out the standard, and the prohibition is within the federal state agreements themselves, the regulations themselves. So is it your position that when the FSAs were entered into, that was already customary? Yes, that was after holding a hearing. That was what the public who had been able to participate had determined was customary. Thank you, Mr. Lutz. Thank you. Mr. Sandberg. May it please the Court, Jeff Sandberg for the federal defendants. The guidance suggests a set of general principles based on existing practices in the division offices for the agency's division offices to use in going about the task of interpreting 52 different federal state agreements, each of which are slightly different, with reference to digital billboards. The guidance on its face clearly does not impose any new legal requirements and thus is interpretive and did not have to pass through notice and comment rulemaking. Wouldn't the guidance prohibit a divisional office from simply saying categorically nothing that flashes is permissible? No, I don't think it does. Would the guidance allow an office to say that? As a strictly legal matter, Your Honor, yes. Of course, the purpose of the guidance is to inform the discretion of division offices, but this guidance read as a whole, as this Court's decisions instruct you to do, makes clear that it is intended as advice to the division offices. Instead of reading it as a whole, what if we read the bold part that's emphasized by the Washington office? Even the bold-faced sentence says that proposed laws, regulations, and policies that would allow permitting CEVMS subject to acceptable criteria as described below would not violate a prohibition on flashing intermittent or moving lights. So it's incorporating by reference. How could an office categorically disallow flashing lights that meet the criteria below? Just say, you know, we're going to be a non-flashing state. Because the agency can speak to its division offices at the level of policy guidance or can speak to its division offices at the level of a legally binding order. And this guidance suggests an interpretation by headquarters, but it does not legally mandate them to take action. And in that way, this is similar to the guidances that this Court has passed upon and concluded were not final in the National Mining Association case and in the Association of Flight Attendants case. But I did want to pick up on the discussion of outstanding. So are you saying, for example, I mean, I think that I would assume if I were representing a state before the 2007 guidance and I told the state, I were in a division office, and I told the state you can't have intermittent lighting in the sense that Mr. Lutz thinks intermittent means you just can't have it, that the state would believe that if they went ahead and had CEVMS, that they might be subject to having some of their funding withheld. And that was just an illusion, you're saying, before 2007? Or that is still true after 2007? That in fact, because this is just a guidance, this is sort of the gist of things as we see it, that actually if Texas now changes its FSA and says have at it, flash away, and you turn around and say, wait a minute, that's highway blight, and withhold their funding, that that would still be legally permissible for the administration to do? That's right. I think the state may well have a good argument that the agency was acting arbitrarily and capriciously if it was acting inconsistently with its own guidance. But as a strictly legal matter, this is guidance to the field, and it is a good thing that agencies are allowed to provide guidance to the field and engage in policy discussion short of engaging in final agency action. Remember, there are 52 different federal state agreements here. Each of them have to be read as a whole. Many of them contain this prohibition on flashing, intermittent, and removing lights, but they also contain other provisions that will need to be read in pari materia with these. What would it have to say to be more than guidance and to be binding? I'm sorry, Your Honor? What would the memo have to say to be more than guidance and to actually be binding? Well, I think it would need to say something other than this is intended to provide advice. Here are some considerations for you to look at, including but not limited to the duration of the sign and the spacing. No, I don't want you to say it would need to say something other than. What would it need to say? I think it would have to speak categorically, as the guidance did in the Appalachian Power Company case, a set of dictates saying these are your marching orders, essentially. That's not the form that this guidance takes. But even if you think that this one sentence, which is not how the agency reads its own guidance, but even if you think that the one boldface sentence that Judge Ginsburg asked me about was a legally binding order, it's still clear here that this guidance is not the consummation of the agency's decision-making about whether digital billboards are permitted in any particular circumstance. What the guidance is saying is you need to... What more is there to come up? Something ongoing? Well, the question here is are digital billboards consistent with FSA prohibitions on flashing, intermittent, or moving lights? And the answer is it depends, and it requires a state-by-state interpretation. And this guidance is saying agencies, you have to engage in a decision-making process that will culminate in final agency action. The very point of this is there needs to be an agency process. And in the same way that this Court concluded that the guidance in National Mining Association and the Association of Flight Attendants was not final, it was because these principles can be reviewed not at the pre-enforcement stage, but upon the application of these principles to a concrete set of facts. That is when the agency undertakes its final agency action. But it's not permitting, because the permitting is done by the states. It's the approval of an FSA, or... The final agency action, in your view, is going to be something that the district office does? That's right. So under the regulations implementing the Highway Beautification Act, states are required to, whenever they're going to change their statutes or regulations or procedures implementing the HBA, they have to put forward a proposal to the federal division office, which will review it. And this is short of amending the FSA itself. This is the state amending its implementing laws. And the federal division office will act on that. It will say yea or nay. There are examples of that in the appendix. There's one from the Indiana office at JA 423 to 424, for example. So that is the final agency action that the Federal Highway Administration undertakes. It is a concrete proposal for a specific state interpreted in light of a specific FSA that yields a specific result. And the plaintiff has disclaimed any intent to seek review of any of those individual proposals. It's instead seeking pre-enforcement review of principles that haven't been applied to any particular federal state agreement. So that's the finality problem here. There is at the threshold, of course, a standing problem, and it may be even easier to dispose of this case on that basis. Because this court started off asking about redressability, which I think is a fine inquiry. Would vacating this guidance, which doesn't change the legal landscape in any way, actually do anything to change the conduct of division offices or states? And I would submit to you that the plaintiff hasn't come close to making a showing that that would be the case. This court in the renal physician's case, for example, said that striking a voluntary safe harbor from the Stark Law, under which hospitals had paid clinicians a little bit lower, that there was no redressability there because hospitals might continue to pay clinicians lower even after the voluntary safe harbor was taken away. But renal physicians also said that it would be a different story if we as a court were to repudiate the agency action. Because it wouldn't be just vacating it, but we would be repudiating the reasoning of the agency so they, in effect, couldn't go back. The agency couldn't, you know, the legal landscape would have changed. So if we were to grant relief on the second claim of Scenic America, which is basically the customary use claim, wouldn't that give them redress? Because in that sense, if we were to repudiate the 2007 memo in that fashion by accepting that claim, the division offices would be forced to prohibit the digital billboards? And or at least permitted to. I'm not sure that you've made a clear, you've really defended the notion that they are no longer allowed to refuse. But I didn't mean to interrupt. Go ahead and answer. First, I want to know, I'm meeting into my co-counsel's time. No, we'll give him his full time. Okay. So as the discussion before picked up on this, the second claim in this case is really quite strange. As it was framed to the district court, it was essentially an alternative argument that if you agree with me that this is a legislative rule, then please don't just send it back for notice and comment rulemaking so the agency can do it again. Please say that the product of such a notice and comment rulemaking would be inconsistent with the federal state agreements. And it was clearly stated in the plaintiff's briefing that if they lost on the interpretive versus legislative, that their customary use claim would go away. So I think this court should take plaintiff at its word and conduct the interpretive versus legislative inquiry first. And I think if you undertake that inquiry, you would necessarily conclude that this is an interpretive document. And so I think that there would be no ability to give redress on the second claim here. I want to point out that the only injury, the only cognizable Article III. What you just said seems to be consistent with the way in which the case has been briefed by the physicians. I do think that seems to be consistent. This being the last issue, if we can get to it. That's right. That's right. And the district court itself said, you know, I'm somewhat surprised that this wasn't framed as an independent 706-2A argument. But I will take plaintiffs at their word and say that if I rule against them on the first claim, I also rule against them on the second. So focusing on the injury prong of standing for a moment, the ground on which the district court found there to be standing was that the district court thought that some of the activities that the organization engaged in might be called something other than advocacy. But what this court's cases make clear is that it doesn't matter whether you call something counseling or education or advocacy. The defendant's conduct has to cause some injury to the plaintiff's activities. And the fact that the defendant's conduct is inconsistent with the ultimate policy goals of the plaintiff is not an Article III injury, in the same way that if I as an individual don't like digital billboards and decide to stand, to sort of commit all my free time to the cause of opposing digital billboards, I would not, through the expenditure of those resources, be allowed to come into court and claim standing. So, too, for organizations. So the cases that they rely on in which organizations were held to have standing were cases in which the defendant's conduct actually injured the organization in some way, by depriving it of information, by depriving it of places for the organization's clients to live. A number of the cases are these cases where you have private landlords that are withholding information or discriminating against the organization. They have no places free of flashing lights for their members to live. That would be true. If they could show a plaintiff who had a member, a plaintiff who had standing, then they would have associational standing. Point it to Minnesota. Yes. So Minnesota. The problem with Minnesota is that Minnesota already permitted digital billboards before 2007. So even though the digital billboard that was near Ms. Lalibert's home wasn't erected until after, the legal landscape was already in place for digital billboards to be permitted in 2007. And there is, at a minimum, a serious redressability problem here. If you vacate this guidance, you know, what is the basis for believing that either the state of Minnesota or the division office in Minnesota is going to take action to conclude that the flashing intermittent or moving light prohibition can't be interpreted? Mr. Lutz pointed us to a document, I think, from Minnesota, but anyway, taking the position that they would do whatever the feds allow. I believe he cited to a page in the administrative record. It's not in the appendix, and I'm afraid I don't have it in front of me. But that would, at most, speak to causation, right? What the division office is saying will generally follow headquarters' lead, whatever they happen to tell us, right? But if you pull away this guidance now, and so you go back to a regime in which division offices are allowed to interpret FSAs as they see fit, you know, who's to say that the division office in Minnesota is now going to conclude that they can't interpret the FSAs in a way that would permit digital billboards that look very much like static billboards of yesterday in their effect, in that they're not flashing or lights moving? I don't think any of us come close to showing that that is what would happen. And so there's a redressability problem with the one Article III injury that they've identified. Are you ready to hear from the interviewees now? If there are no further questions, we would ask that the court vacate with instructions to dismiss for light standing. It might be. Just give me a moment. What did you have to say on the customary point to the Supreme Court's decision on the Daniel Ball navigable waters? Right. I'm afraid I can't shed that much light on it, because the way that the customary use claim has been pitched here is one that is a derivative of the interpretive versus legislative. The plaintiffs have said essentially customary use, we think, is supplanted by the federal state agreement, such that if you're legitimately interpreting the FSA, then it's okay. It's consistent with customary use. It's only if you've, quote, redefined the FSA that there would be a problem with customary use. But, you know, we did address in a few pages of our brief that the sub. The question raised in that by their citation of the Daniel Ball case is whether the statute freezes the custom as of 1965. Well, whatever else may be true about customary use, it does not do that. It's very clear from the legislative history of the act that the consistent with customary use requirement was added in order to ensure that the federal government wouldn't try to impose nationwide standards on all states that may be much more strict than what was there before. I think you're making a slightly more nuanced argument, which is, yes, it's not frozen. We look at the FSAs, and that's a, you know, a dynamic process. It allows for updating only when the states and the federal government negotiate and update. And in practice, it's actually been pretty static, they're saying. But whatever, whether it's static or not, there is some stability to what the FSAs reflect. So it's a little bit of both. I think Your Honor's take is hinting at a third claim that they had made in the district court and had been abandoned on appeal, which is that the problem, their theory was that the problem here is that the state and the federal government didn't amend the FSAs in a way to make this kosher. I think everyone, in the posture in which this case is on appeal, everyone agrees that you're allowed to interpret the FSAs. Yes. And the only question is whether this is a permissible interpretation. Yes. No, I'm not disagreeing with that. But that itself is kind of a backdoor argument, not a straightforward 706-2A argument. Backdoor in what? I mean, backdoor because it's bringing a question of lack of arbitrariness in? That's the backdoor you're for? Right. So their theory for why this is an interpretive rule rather than a legislative rule, as I understand it, is that it adopts an interpretation that is 180 degrees counter to the text of the FSAs. And I don't think that's right. I think that terms like intermittent and flashing are necessarily subject to interpretation. In their petition for rulemaking to the agency, they said intermittent means not more frequently than once every 12 hours. We happen to have a different interpretation of intermittent, but those are both valid interpretations of the term. I thought I heard Mr. Lutz say that no change, even after 12 hours, would be allowed. Any change would be intermittent. That may be the position that he's taken here and in their briefs. But in the rulemaking petition, and there's a footnote in our brief, in the government's brief. No, in the court, but in another proceeding. In a petition for rulemaking that was submitted to the Federal Highway Administration. So I think there's broad agreement here that terms like intermittent have to be. I don't think that can be used against them in this case. It's another proceeding. Okay. Well, I haven't heard them dispute that the term intermittent is subject to interpretation. I mean, for example. That was a few minutes ago. That's exactly what Mr. Lutz said. I don't think they would dispute that, for example, a traditional billboard with paper and paint buckets could be illuminated by a light that turns on at dusk and turns off at dawn. And that is an intermittent light. I thought that was the New York situation that Mr. Lutz said indeed is intermittent. Maybe he'll clarify it on. The New York situation is once every 24 hours. We can ask on rebuttal. Yeah. Okay. Thank you, Mr. Sandberg. Thank you. Mr. Shanmugam. Thank you, Judge Pillard, and may it please the court. OAAA agrees with the government's submissions in this case. And in the remaining time, I'd like to focus on two principal points. First, as the district court correctly determined here, all four of the familiar American mining factors support the conclusion that the 2007 guidance is an interpretive rather than legislative rule. And in particular, an adequate basis for agency enforcement existed apart from the guidance, and the guidance did not effectively amend a prior legislative rule. Second, as the district court also correctly determined, the 2007 guidance is consistent with the language of the HBA concerning customary use. And, Judge Pillard, since you asked about the meaning of that reference to consistency with customary use, let me offer an attempt at an affirmative interpretation. In our view, that language at most imposed a restraint on the federal government in including in the federal-state agreements in the first place novel limitations. And so while I would acknowledge that the language is structurally a little bit confusing, I do think that, as Mr. Sandberg suggested, the legislative history makes clear that the concern that animated Congress when this language was added to the bill that became the HBA in 1965 was a concern with the federal government going too far in imposing restrictions on billboards in the federal-state agreements. Now, we think that the district court correctly analyzed... Is there any way to get to that without legislative history? Well, I do think that it is a fair interpretation of the text standing alone because, leaving aside for the moment this question of what customary and customary use actually means, I do think that the first reference to customary use in Section 131D, and there are actually two, operates on and limits the federal-state agreements. And there's no dispute here that the relevant provisions of the federal-state agreements, that is to say the provisions prohibiting flashing intermittent or moving lights, are themselves consistent with customary use. Now, I think what I heard Mr. Lutz to be suggesting today is that once a provision is included in an FSA, that somehow becomes the baseline against which customary use is measured. I really don't think that that language can be read in that fashion. And, again, I think the legislative history really suggests that what Congress was concerned about was the terms of the federal-state agreements themselves. I'm not sure that that's what he's saying. I think he's saying that there's a process between the feds and the states, and your clarification is helpful, that approves FSAs that may not stray from customary use, but that once those are in place, sort of the work of customary use is done and that it's reflected in those FSAs, that they now instantiate customary use. And so then what the FHA is doing in offering guidance is just saying back to them, okay, this is custom, this is what we see, and to the extent that what shows up in custom is a bar on dynamic lighting, this is what it means. So, Judge Pillard, we would agree with that, I think, in part, which is to say that we think that the work of that first reference to customary use is done when the FSAs are adopted. But leaving aside the question of whether or not they do further work, I think Mr. Lutz would have to concede, as his brief makes clear, that his argument under the HBA turns on the notion that any interpretation adopted in the guidance somehow constituted a redefinition of the terms of the FSAs themselves. In other words, that the interpretation has to be so out of whack with the terms of the FSAs as to be tantamount to the adoption of new terms that, therefore, have to be measured against the customary use requirement. And if you take a look at the statement of issues on the very first page of the brief, it bakes into the question presented this notion that there is somehow a redefinition, and, of course, that's how Judge Boasberg understood the HBA claim. And as a result of that, I think, as Mr. Sandberg rightly said, that the HBA claim really stands or falls with the argument on whether this is an interpretive or legislative rule because, as your honors will be aware, one of the principal arguments that Scenic America makes in that regard is that this interpretation is 180 degrees counter to the language of the relevant FSAs and, therefore, essentially constitutes the adoption of a new legal norm which is sufficient to tip it into the category of legislative rules. Now, whatever you think about the meaning of flashing, moving, or intermittent lights, I really don't think that it can be said that this is not within the range of permissible interpretations of those terms. And Judge Ginsburg, while it may not strictly speaking be binding on Scenic America, that in a petition for rulemaking, seeking rulemaking on this very issue, they suggested that a 12-hour period would not be intermittent. I think it reflects the fact that it isn't the only permissible interpretation of those terms, that a sign can never change. And that is really all that's required under the uber-deferential standard of review for purposes of determining whether something is an interpretive or legislative rule. And that's... I was waiting to hear you give the sort of lawyerly analysis of how you get there that Mr. Lutz was saying is missing. Do you have that? Well, if we were here on an arbitrary or capricious challenge, I would be perfectly prepared to talk about this in terms of our deference. Just about its non-arbitrariness. Just run it by us. Assume there's some level of deference. Why is it non-arbitrary to say that where there's a ban on flashing or intermittent lighting, it's okay to flash at four-second intervals or eight-second intervals? Well, I think it's important, and not to quibble, but I'm going to quibble briefly. These are not flashing signs in the sense that they are flashing in the way that my light would be flashing here. These are signs that are static billboards that then change over specified intervals. And our submission is much like Mr. Sandberg's submission in the sense that we simply don't think that, by virtue of the fact that a sign changes, that renders it flashing, intermittent, or moving. And, again, we think that this is a sort of classic issue of agency deference, where the agency, taking into account considerations such as safety, can make determinations about the point at which something becomes intermittent. I think you can probably do better than that. I hope you can do better than that because, I mean, it changes. A movie screen, the pixels are changing. I would say that's flashing, moving, or intermittent. You would not? I think one might disagree with that, particularly given the fact that these are terms that were obviously adopted at a time when this technology did not exist. But leaving all of that, well, actually not leaving all of that aside, because it does go to the analysis on interpretive versus legislative rules in one other sense. It goes to the other principle argument that Mr. Lutz made and that Scenic makes in the briefs, this argument about the impermissibility of numerical standards and the suggestion that by virtue of the fact that there are numerical standards in the guidance, that this constitutes a legislative rule. I want to say just a couple of things about that, which are hopefully responsive to your questions, Judge Pillard. The first is that it's, of course, important to realize that to the extent that the guidance sets out these ranges and recommendations that division offices have previously adopted, it does not purport to bind division offices going forward. One can dispute whether the guidance was binding to the extent that it said that these prohibitions do not categorically prohibit digital billboards. That was one part of the analysis, and in the boldface language to which Judge Ginsburg referred, it is true that FHWA suggested that that interpretation is off the table. But with regard to these ranges, all that FHWA purported to do was to say, this is what division offices have done in the past. It may be useful to you division offices in considering future proposals. Second, on this question of numerical standards, I don't think that... We have identified, this is on JA 537, we have identified certain ranges of acceptability. And so they're saying these have been adopted by states. We're going to accept them. But if you continue on to the end of that sentence, it does go on to say... That have been adopted by the states would be useful. That will be useful in reviewing state proposals on this topic, which does suggest, I think consistent with other language in that section of the guidance, that the division offices retain the discretion to determine that particular proposals are inconsistent with the prohibitions on flashing intermittent or moving lights. And division offices retain the authority to assess those proposals on any of these five specified criteria. But for the most part, the division offices aren't going to see things at this level of granularity. That's permitting, and that's done by the states, and that doesn't have to be run through the division office. Well, the specific permitting decisions don't, but the regulations adopted by states on digital billboards certainly do. So a state presumably, though, could just work all of these terms, 4 and 10 seconds, 1 and 4 seconds, into their regulation, and presumably the administration, the Federal Highway Administration, would say, great, that's just what we expected. Well, they could, and that would be a matter for the division offices. And to be sure, I think the division offices have generally consistent with the past practice, now approve regulations that have these features. But in some sense, let me get to my second point, because even if you disagree with me on the first point, I think that the second point is an important one. I think if you look at the cases on numerical standards that SENIC primarily relies, and it's really primarily the Seventh Circuit's decision in Hawker, but also this Court's decision in the Catholic Health Initiatives case, I think that those cases make clear that numerical standards are not in and of themselves sufficient to tip some agency action into the legislative rule category. And I think in particular, if you take a look at Judge Posner's opinion in the Hawker case, that opinion really has a very strong flavor of arbitrary and capricious review about it, because Judge Posner repeatedly referred to the fact that there was something arbitrary about the notion that an agency could establish a height requirement for fences when the underlying regulatory obligation was simply that fences be of a particular structural strength. Here, by contrast, you have these terms, flashing, intermittent, or moving, that necessarily contemplate a durational element. And one might quibble about what the appropriate durational period is to render something flashing, intermittent, or moving. But that is the classic sort of issue on which an agency gets deference. And sure, if Scenic America had come into court and argued that the particular choices here were arbitrary or capricious because the agency failed to provide a sufficient policy justification for choosing the ranges that it did, that would be a classic arbitrary and capricious challenge with which this Court is well familiar. But that is really not what is going on here. And I would just note, circling back to my first point, that to the extent that the guidance does not contain a detailed policy analysis or the sort of lawyerly appellate-type exegesis that Scenic seems to think is required, that is simply because what FHWA was doing was simply precisely summarizing what division offices had previously done. And that goes to the question of whether there is final agency action, but it certainly suggests at a minimum that what FHWA did here was interpretive. Thank you, Mr. Chamberlain. Thank you. I know we used up all your time, but we'll give you a couple of minutes, Mr. Lutz. Can you clarify what your position is about the New York 12-hours? Our position is that it needs to remain steady continuously, not just the 12 hours. And, in fact, it was very nice of the Highway Administration to reference Scenic America's rulemaking petition because they haven't responded to it yet. Scenic America filed it in 2010 in another attempt to get the ability to comment on the question of whether digital billboards are allowed under the federal-state agreements and have not gotten any response from the administration. And briefly, what is your response to the government's argument that the final agency action comes when the divisional office makes the decision? I would point to the language of the guidance itself. Your Honor, the Highway Administration has done us all a favor of highlighting in bold what's the important language here, which they use in the words of Appalachian Power Company. They use mandatory, not permissive language by saying that acceptable criteria do not violate a prohibition against intermittent flashing or moving. This was not only in the guidance itself but in the e-mail that was sent out attaching the guidance from headquarters office. And on Joint Appendix page 538, the conclusion asks that or explains that they're sending out the guidance memorandum to achieve national consistency, which indicates to me that it's trying to get those pesky division offices in line that aren't remaining consistent. This is really on all fours with NRDC v. EPA, which has not been mentioned yet here. In that case, the EPA had sent out a headquarters guidance that was aimed at regional offices. It removed their discretion to reject implementation plans that didn't meet statutory fees provision by allowing an alternative. And the court found that that had bound regional offices and was a final agency action. The district court thought that that was really analogous to here. I also just wanted to make one point with regard to redressability. Judge Wilkins, you mentioned Reno Physicians Association and the point where if the court were to repudiate a position that that could give redressability. Two of the reasons for why you would find this to be a violation of the notice and comment provisions is that the 2007 guidance has created arbitrary numeric criteria and is 180 degrees counter to the regulations it claims to interpret. Both of those would be repudiations of the 2007 guidance and would tell the division offices that they could not select something along the lines of four to ten seconds. Thank you. Oh, I'm sorry. Ms. Glutz, you're familiar with the Post Properties case, I trust? Yes. We said there, referring back to more of these injury questions, in both BMC and SPAM, the plaintiff organizations chose to redirect their resources to counteract the effects of the defendant's allegedly unlawful acts. They could have chosen instead not to respond. In neither case did our standing analysis depend on the voluntariness or involuntariness of their expenditures. Instead, we focused on whether they undertook the expenditures in response to and to counteract the effects of the defendant's alleged discrimination, rather than in anticipation of litigation. So how is your claim on standing to injury for the organization consistent with that? I think it's explained well. So the voluntariness or non-voluntariness? No, that is whether the expenditures you've referenced in your brief and in the affidavits, whether those are undertaken to counteract the effects of the defendant's decisions. Yes, so two things have happened to Scenic America since the 2007 guidance. Not only, like in Metropolitan Washington, has it been more difficult for them to rely on division offices' reasonings in front of zoning boards. That's back to lobbying. Yes, but there's also the increase in digital billboards in the members' and constituents' neighborhoods. So it's not only that it's become more difficult for them, so they're running uphill against the tide of digital billboards, but the 2007 guidance has pulled away the ability for them to rely on the division offices' interpretations to reject. I don't think that's consistent with the Havens' requirement that the lobbying, litigation, and so on is not a cognizable injury. In Havens, it was the diminution of the stock of housing. Here, it's the increase in the number of digital billboards that is the same type of harm to the members. Well, that's the harm you invoke for the individual, right? Yes, and not only is it a harm for the individual members, but it's a harm for the organization because the organization had previously had a portfolio of other programs, a conservation director. That's a resource allocation decision about moving your resources from other programs to this. It doesn't tell us whether this is still just advocacy. It's not only advocacy. It's counseling and education along the lines of what HOME was providing its constituents. It was providing services to them. Very similar to how if you read the Lloyd Declaration, Joint Appendix 39-42, since the 2007 guidance, she's had to provide counseling, educational materials, managed websites, et cetera. Thank you. Thank you, Mr. Lutz. Case is submitted.
judges: Pillard, Wilkins, Ginsburg